<pre>
 1               IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF RHODE ISLAND


 3

 4
       * * * * * * * * * * * * * * *   C.R. NO. 15-120M
 5                                  *
       UNITED STATES OF AMERICA     *
 6                                  *
           VS.                      *   FEBRUARY 29, 2016
 7                                  *   10:00 A.M.
       RAFFAELE MARZIALE            *
 8     * * * * * * * * * * * * * * *   PROVIDENCE, RI

 9

10            BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

11                         DISTRICT JUDGE

12
                     (Change of Plea Hearing)
13

14     APPEARANCES:

15     FOR THE GOVERNMENT:    SANDRA R. HEBERT, AUSA
                              U.S. Attorney's Office
16                            50 Kennedy Plaza
                              Providence, RI  02903
17
       FOR THE DEFENDANT:     THOMAS F. CONNORS, ESQ.
18                            454 Broadway
                              Providence, RI  02903
19
       Court Reporter:        Karen M. Wischnowsky, RPR-RMR-CRR
20                            One Exchange Terrace
                              Providence, RI  02903
21

22

23

24

25
</pre>

1    29 FEBRUARY 2016 -- 10:00 A.M.

2         THE COURT:  Good morning, everyone.  We're here

3    this morning for a change of plea in the case of the

4    United States versus Raffaele Marziale.

5         THE DEFENDANT:  Yes.

6         THE COURT:  Did I say it right?  Criminal Action

7    Number 15-120-03.  Would counsel identify themselves

8    for the record, please.

9         MS. HEBERT:  Sandra Hebert for the United

10   States.

11        THE COURT:  Good morning, Ms. Hebert.

12        MR. CONNORS:  Thomas F. Connors for

13   Mr. Marziale, your Honor.

14        THE COURT:  Good morning, Mr. Connors.

15        MR. CONNORS:  Good morning, your Honor.

16        THE COURT:  Mr. Marziale, would you stand, and

17   Ms. McGuire will swear you in.

18        (Defendant sworn.)

19        THE CLERK:  Would you please state your name and

20   spell your last name for the record.

21        MR. CONNORS:  Raffaele Marziale,

22   M-A-R-Z-I-A-L-E.

23        THE COURT:  Mr. Marziale, would you just pull

24   the microphone in close to you.

25        Actually, Tom, the thing has popped off of it.

1       Great.  Thanks.

2               Mr. Marziale, you're under oath, and that

3       requires you to give me truthful answers to the

4       questions I ask.  Do you understand that?

5               THE DEFENDANT:  Yes, your Honor.

6               THE COURT:  Okay.  And if you fail to give me

7       truthful answers, further charges can be brought

8       against you, like perjury or other charges.  Do you

9       understand that as well?

10              THE DEFENDANT:  Yes, your Honor.

11              THE COURT:  Now, Mr. Marziale, there's a plea

12      agreement in this case that you signed, your attorney

13      signed, the Government signed.  Do you recall signing

14      that plea agreement?

15              THE DEFENDANT:  Yes, I do.

16              THE COURT:  Okay.  And did you sign that plea

17      agreement after you read it?

18              THE DEFENDANT:  Yes.

19              THE COURT:  And did you sign that plea agreement

20      after you discussed it thoroughly with your attorney?

21              THE DEFENDANT:  Yes, I did.

22              THE COURT:  And did he answer any questions that

23      you had about that plea agreement?

24              THE DEFENDANT:  Yes, he did.

25              THE COURT:  And did you knowingly and

1    voluntarily sign that plea agreement?

2              THE DEFENDANT:  Yes, I did.

3              THE COURT:  Sir, how old are you?

4              THE DEFENDANT:  Forty-two.

5              THE COURT:  And how far did you go in school?

6              THE DEFENDANT:  A couple years of community

7    college.  I'm a couple credits short of an associate's

8    degree, I believe.

9              THE COURT:  And have you been treated recently

10   for any mental illness or addiction to narcotic drugs?

11             THE DEFENDANT:  No.

12             THE COURT:  And as you sit here today, are you

13   under the influence of any medication, drugs or

14   alcoholic beverages of any kind?

15             THE DEFENDANT:  Well, I have a medical

16   condition, so I take medication every day.

17             THE COURT:  Okay.  What medicines do you take?

18   What medicines did you take yesterday or today?

19             THE DEFENDANT:  I take medicine for my lungs.  I

20   have pulmonary hypertension.  Do you need the names of

21   the medicines or --

22             THE COURT:  If you know them.

23             THE DEFENDANT:  Yes.  TYVASO, it's an inhaling

24   device.  It's a liquid medicine that goes in a

25   nebulizer.  I do that four times a day.  Adcirca,

1    they're two pills.  They're for my lungs, to keep the

2    pressure down.  Letairis is another pill for my lungs.

3    Omeprazole, it's a pill for pre-pharynx cancerous

4    disease.  I have scleroderma as well.  Amlodipine, it's

5    for -- I have Raynaud's.  And a couple others, like

6    vitamins, stuff I don't have the names.

7            THE COURT:  Do any of the medications that

8    you're taking now affect your ability to think clearly?

9            THE DEFENDANT:  No.

10           THE COURT:  Do they cloud your head at all in

11   any fashion?

12           THE DEFENDANT:  No.

13           THE COURT:  Do they make you sleepy?

14           THE DEFENDANT:  Sometimes.

15           THE COURT:  When's the last time you took any of

16   the medications that make you sleepy?

17           THE DEFENDANT:  Well, it depends.  I don't

18   remember, but sometimes I can get joint pain and

19   fatigued.

20           THE COURT:  As you sit here today, have any of

21   the medications affected your ability to think clearly?

22           THE DEFENDANT:  No.

23           THE COURT:  You feel fully -- despite the number

24   of drugs that you're taking for various conditions, do

25   you feel that you're able to make decisions in your own

1    best interest today?

2         THE DEFENDANT:  Absolutely.

3         THE COURT:  And your mind is clear?

4         THE DEFENDANT:  Yes.

5         THE COURT:  Okay.  Now, in addition to the plea

6    agreement, have you reviewed the Indictment, that is,

7    the written charges that the Government has brought

8    against you in this case?

9         THE DEFENDANT:  Yes, I did.

10        THE COURT:  And did you review those with your

11   attorney?

12        THE DEFENDANT:  Yes, I did.

13        THE COURT:  And did he answer any questions that

14   you have about the Indictment or the consequences of

15   the Indictment?

16        THE DEFENDANT:  Yes, he did.

17        THE COURT:  And, Mr. Marziale, are you

18   completely satisfied with the representation that

19   you've received from your attorney in this case?

20        THE DEFENDANT:  Yes, I am.

21        THE COURT:  Now, sir, if you change your plea to

22   guilty -- strike that.  Under the Constitution and laws

23   of this country, you have certain rights.  If you

24   change your plea to guilty, you'll give up the rights

25   that you currently have under the Constitution and laws

1    that I'm about to tell you.

2          I want to make sure that you understand that you

3    have these rights and that by changing your plea to

4    guilty, you'll give up these rights.

5          THE DEFENDANT:  I understand.

6          THE COURT:  You have a right to plead not guilty

7    as you have so far, and you have a right to continue in

8    that plea of not guilty.

9          If you were to continue in the plea of not

10   guilty, you would be entitled to a trial by a jury.  At

11   that trial, the Government would have to prove each and

12   every element of the charges it brings against you

13   beyond a reasonable doubt.

14         At that trial you would have a right to see,

15   hear, confront, cross-examine, have your attorney do

16   so, all of the evidence and the witnesses that the

17   Government would put on in order to prove its case

18   against you.

19         You would also have a right to present evidence

20   in your own defense.  In fact, you could compel people,

21   subpoena them, to come to court to testify in your

22   defense.

23         You would also have a right to testify at that

24   trial.  Perhaps more importantly, though, you would

25   have a right not to testify.  And if you chose not to

1    testify, that fact could not be used against you by the

2    jury or the Court or anyone else.

3         You also have a right to counsel, and the Court

4    would appoint counsel for you if you couldn't otherwise

5    afford one; and the Court would appoint counsel for you

6    throughout all of the proceedings.

7         But if you change your plea to guilty, you'll be

8    giving up all of these rights that you have and there

9    will be no trial.  Do you understand that you have

10   these rights?

11        THE DEFENDANT:  Yes, I do.

12        THE COURT:  And do you understand that if you

13   change your plea to guilty, there will be no trial and

14   you'll give up all of these rights?

15        THE DEFENDANT:  Yes, I do.

16        THE COURT:  Now, sir, has anyone in any way

17   attempted to force you to plead guilty or threatened

18   you in any way to get you to plead guilty?

19        THE DEFENDANT:  No.

20        THE COURT:  Has anyone made any promises or

21   assurances to you other than what's contained in the

22   plea agreement in order to get you to plead guilty in

23   this case?

24        THE DEFENDANT:  No.

25        THE COURT:  So are you knowingly and voluntarily

1    asking this Court to allow you to change your plea to

2    guilty because you believe at this time it's in your

3    personal best interest to do so?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Now, I want to describe to you what

6    the maximum penalties are that you face at the time of

7    sentencing for the five counts.  My understanding is

8    that you're prepared to plead guilty to Counts I, V,

9    VI, XIII and XIX; is that correct?

10             THE DEFENDANT:  Yes.

11             THE COURT:  As to Counts I, V and VI, as to

12   each of those counts, there's a maximum period of

13   incarceration of 30 years, a maximum fine of one

14   million dollars, a period of supervised release of five

15   years, and there will be a $100 mandatory special

16   assessment.

17             As to Counts XIII and XIX, there's a mandatory

18   two-year consecutive period of incarceration,

19   consecutive to the sentence that's imposed as to

20   Counts I, V or VI, there's a $250,000 maximum fine, a

21   one-year period of supervised release and a $100

22   mandatory special assessment.

23             Now, if the Court were to impose the maximum

24   sentence as to each of the counts and if the Court were

25   to impose them consecutively, meaning to be served

1    consecutively, meaning one after the other, then the

2    maximum period of incarceration the Court could impose

3    is 94 years, there's a $3.5 million fine, up to 17

4    years of supervised release, and there will be a $500

5    mandatory special assessment.

6         Do you understand that these are the penalties,

7    the maximum penalties, that the Court could impose at

8    the time of sentencing?

9         THE DEFENDANT:  Yes, I do.

10        THE COURT:  Do you also understand that if the

11   Court imposes a period of supervised release, that if

12   you violate any of the conditions of supervised

13   release, further jail time can be brought upon you?  Do

14   you understand that as well?

15        THE DEFENDANT:  Yes, I do.

16        THE COURT:  Mr. Marziale, are you a citizen of

17   the United States?

18        THE DEFENDANT:  Yes, I am.

19        THE COURT:  As a citizen of the United States,

20   you have certain valuable civil rights that you could

21   lose by pleading guilty to this felony.

22        You could lose the right to vote, the right to

23   hold public office, the right to serve on a jury and

24   the right to possess any kind of firearm or ammunition.

25        Do you understand that you could lose these

1    valuable civil rights if you plead guilty to these

2    felonies?

3              THE DEFENDANT:  Yes, I do.

4              THE COURT:  Ms. Hebert, are there forfeiture

5    allegations?

6              MS. HEBERT:  No, your Honor.

7              THE COURT:  Okay.  Thanks.

8              Now, I want to make sure you understand how the

9    Court will determine what an appropriate sentence is in

10   this case.  At some point after the change of plea,

11   you'll be asked to meet with the Probation Department

12   next door in the Pastore Building.

13             You have a right to have your attorney present

14   with you for that interview, and I encourage you to

15   make sure your attorney is present with you for that

16   interview.

17             The Probation Department will interview you, and

18   then they'll conduct other investigation, and they'll

19   prepare a presentence report.  That report will give me

20   information about your background and various other

21   information that the Court will use at the time of

22   sentencing.

23             It will also calculate the advisory sentencing

24   guidelines.  Those are guidelines that assist the Court

25   in determining what an appropriate sentence may be.

1    The Court has not determined what the advisory

2    sentencing guidelines are yet.

3         Now, your attorney may have calculated what he

4    thinks they'll be or the Government may have calculated

5    them and told your attorney what it thinks they may be.

6    I won't determine the advisory sentencing guidelines

7    until after the presentence report is issued.

8         Your attorney and the Government's attorney have

9    a chance to object to the calculation, I'll rule on the

10   objections, and then I'll determine at the time of

11   sentencing what the appropriate advisory guideline

12   range is.

13        Do you understand as we sit here today we don't

14   know what the advisory guideline range is?

15        THE DEFENDANT:  Yes, I do.

16        THE COURT:  Do you also understand, though, that

17   you made certain concessions that will affect the

18   guideline range?

19        So you made a concession that the amount of loss

20   here falls in between $250,000 and $550,000.  That will

21   affect the guideline range.  Do you understand that?

22        THE DEFENDANT:  Yes, I do.

23        THE COURT:  Do you understand that you've agreed

24   to that range?

25        THE DEFENDANT:  Yes.

1    THE COURT:  Okay.  Do you also understand that

2    you've agreed that the crime involved here involved

3    more than 10 victims and that by agreeing to that, that

4    that will, in fact, affect the guideline range?  Do you

5    understand that as well?

6        THE DEFENDANT:  Yes.

7        THE COURT:  Okay.  You won't have a right to

8    object to either of those two as part of the guideline

9    calculation.  Do you understand that?

10       THE DEFENDANT:  Yes.

11       THE COURT:  Do you also understand that as part

12   of the plea agreement you've agreed to waive any right

13   to appeal the sentence that the Court imposes if the

14   sentence is at or below the guideline range?  Do you

15   understand that as well?

16       THE DEFENDANT:  Yes.

17       THE COURT:  Okay.  And, finally, do you

18   understand that in the federal system at this time

19   parole has been abolished; that is, there is no right

20   to apply for parole from incarceration?  You will serve

21   the entire time that the Court imposes, minus some time

22   off for good behavior, but there is no right to apply

23   for parole the way there is in the state system.  Do

24   you understand that as well?

25       THE DEFENDANT:  Yes.

1    THE COURT:  I'm going to ask the U.S. Attorney,

2    Assistant U.S. Attorney now to -- not U.S. Attorney

3    yet, maybe some day, to tell us what the facts are

4    that -- to tell us what the elements of the five counts

5    are that you're prepared to plead guilty to and to tell

6    us what facts the Government would introduce if this

7    case were to go to trial.

8         I want you to pay particular attention to the

9    facts because at the end of it, I'm going to ask if you

10   admit the facts as stated by the Government as true.

11   Okay?

12        THE DEFENDANT:  Yes.

13        THE COURT:  Ms. Hebert.

14        MS. HEBERT:  Yes, your Honor.  The elements of

15   conspiracy to commit bank fraud are as follows:  First,

16   that the conspiracy charged in the Indictment existed

17   between at least two people to commit bank fraud;

18   second, the Defendant willfully joined in the

19   agreement; and third, that one of the co-conspirators

20   committed an overt act during the period of the

21   conspiracy in an effort to further the purpose of the

22   conspiracy.

23        The elements of bank fraud are as follows:

24   First, the financial institutions alleged in this case

25   to be Washington Mutual Bank, Flagstar Bank, Bank of

1    America, Wells Fargo and Sierra Pacific were federally

2    insured or were Federal Reserve banks or members of the

3    Federal Reserve system; second, the Defendant engaged

4    in a scheme substantially as charged in the Indictment

5    to defraud or made false statements or

6    misrepresentations to obtain money from the

7    institution; and third, that the Defendant acted

8    knowingly.

9         The elements of aggravated identity theft are as

10   follows:  First, that the Defendant committed the crime

11   of conspiracy to commit bank fraud and bank fraud;

12   second, that during and in relation to those crimes,

13   Defendant knowingly transferred, possessed or used

14   without lawful authority the means of identification

15   described in the Indictment.

16        Finally, with respect to some counts, the

17   Defendant is charged with aiding and abetting.  The

18   elements of aiding and abetting are, first, that

19   someone else committed the charged crime and, second,

20   that the Defendant consciously shared the person's

21   knowledge of the underlying criminal act, intended to

22   help him and willfully took part in the endeavor

23   seeking to make it succeed.

24        Had this case proceeded to trial, the

25   Government's evidence would have established the

1    following facts with regard to the Defendant:  First,

2    the Government would ask the Court to incorporate the

3    facts alleged in the Indictment.

4         Secondly, the Government would have established

5    the following:  Beginning on or about October 9th,

6    2007, and continuing until on or about December 16th,

7    2013, the Defendant, Raffaele Marziale, conspired with

8    real estate attorney and broker Louis Marandola, loan

9    originator Brian McCaffrey, loan processor Lauren

10   Sienko, real estate agent Gina Ronci Mohamed and real

11   estate investor Edwin Rodriguez to commit bank fraud in

12   connection with the purchase, sale and mortgage

13   financing of residential real estate.

14        The conspirators devised an elaborate scheme to

15   fraudulently obtain residential real estate loans, many

16   of them insured by the Federal Housing Administration,

17   through the submission of false documents to lenders

18   and the concealment of material facts from those

19   lenders.

20        The co-conspirators also stole money from the

21   buyers and sellers of real estate who had sought

22   assistance from the conspirators with real estate

23   transactions.  They often did this by creating two sets

24   of documents accounting for the expenses associated

25   with the real estate transaction.

1          Prior to June 2010, Marziale worked as a loan

2    officer for Evergreen Mortgage Advisors in Lincoln,

3    Rhode Island.  Marandola, McCaffrey and Sienko worked

4    in the same office building as Marziale in Lincoln,

5    Rhode Island.

6          In 2007, Marziale and Sienko assisted McCaffrey

7    in obtaining a mortgage loan from Washington Mutual

8    Bank to purchase 15 Metcalf Street, Providence, Rhode

9    Island, a property owned by Marandola and Joseph

10   Picozzi, Marziale's employer at this time.

11         McCaffrey's loan application included false

12   supporting documents, including a false HUD-1 form

13   prepared by Marandola and a false verification of

14   mortgage form signed by Sienko.  The verification of

15   mortgage form was also signed by McCaffrey and

16   Marandola's wife.

17         Washington Mutual ultimately approved

18   McCaffrey's loan based in part upon the fraudulent

19   documents submitted.

20         Marandola, through his real estate escrow and

21   title insurance business, Amerititle, LLC, served as

22   the settlement agent for the closing of McCaffrey's

23   fraudulently obtained Washington Mutual loan.

24         Several years later in 2010, Marandola moved his

25   law office to 715 Branch Avenue, Providence, Rhode

1    Island.  McCaffrey, who accepted a job as a branch

2    manager for Sierra Pacific Mortgage Company in 2010,

3    decided to share office space and expenses with

4    Marandola unbeknownst to Sierra Pacific.

5         Sienko, who was hired by Sierra Pacific to serve

6    as a loan processor, went with McCaffrey to 715 Branch

7    Avenue.

8         In July 2011, Marandola and Amerititle were

9    barred from serving as settlement agent by Sierra

10   Pacific.  As a result, Marandola created Clean Close

11   Title & Escrow.

12        In order to continue to do business with

13   Marandola, who paid expenses associated with the Branch

14   Avenue operation, McCaffrey and Sienko represented to

15   Sierra Pacific that Attorney Robert McNelis served as

16   the closing attorney on behalf of Clear Close when, in

17   fact, the loans were closed by Marandola.

18        Marziale moved to Branch Avenue with Marandola,

19   McCaffrey and Sienko.  Marziale, who had been unable to

20   obtain a loan originator license despite multiple

21   attempts, began to work as a loan officer under

22   McCaffrey's name and license.  Marziale did this with

23   McCaffrey's knowledge and consent.

24        To conceal Marziale and Marandola's involvement

25   from their supervisors and corporate personnel at

1    Sierra Pacific, McCaffrey and Sienko asked Marziale and

2    Marandola to leave the offices when Sierra Pacific

3    personnel came for a visit.

4         In order to effectuate the scheme, each

5    co-conspirator had a role to play without which this

6    scheme could not have succeeded.  Marandola, who served

7    as the settlement or closing agent on the fraudulent

8    real estate transactions alleged in the Indictment,

9    controlled the funds through his escrow account, paying

10   expenses of the scheme and paying Marziale, McCaffrey,

11   Sienko and others for their efforts to close the loans.

12        Marandola created and approved false documents

13   as part of the scheme.  Marziale, working as a loan

14   officer, often impersonated McCaffrey with prospective

15   borrowers.

16        Marziale created or caused to be created false

17   documents in support of the loans which he then

18   provided to Sienko and McCaffrey for submission to

19   Sierra Pacific.

20        It was Marziale's practice to e-mail McCaffrey

21   and Sienko when he had a borrower coming who thought

22   Marziale was McCaffrey so that they would know to play

23   along.  Sienko assisted Marziale by directing borrowers

24   to contact Brian at Marziale's number.

25        McCaffrey and Sienko as Sierra Pacific employees

1    submitted the loan documents for loans originated by

2    Marziale to Sierra Pacific under McCaffrey's name and

3    license.  McCaffrey, who received compensation from

4    Sierra Pacific for loans originated by Marziale, caused

5    Sierra Pacific to compensate Marziale for his work by

6    submitting false invoices to Sierra Pacific for

7    marketing services.

8         Through these false invoices, McCaffrey caused

9    Sierra Pacific to pay Marziale for marketing when, in

10   fact, Marziale was working as an unlicensed loan

11   officer.

12        Ronci worked as a real estate agent under

13   Marandola.  She assisted the conspirators in getting

14   approval for the loans sought by creating documents and

15   listing properties, giving the false impression that

16   she actually listed and marketed the properties when,

17   in fact, she did not.  She did this so as to give the

18   false impression that the real estate transactions were

19   arm's length.

20        Many of the fraudulent loans described in the

21   Indictment and originated by Marziale through McCaffrey

22   and Sienko were for properties owned by Rodriguez under

23   the name of family members.

24        These properties include 50 Chatham Street,

25   35 Robin Street, 55 Gillen Street, 71 Wallace Street

1   and 46 Magdalene Street.

2       Additionally, 71-73 Parnell Street was owned by

3   an associate of Rodriguez's.  Rodriguez recruited

4   buyers for the homes and had them apply for a loan

5   through Marziale, McCaffrey and Sienko.

6       Marziale, McCaffrey and Sienko had no contact

7   with the borrowers.  They went through Rodriguez, and

8   they did not verify documents provided to them by

9   Rodriguez.

10      When Marziale needed a verification of rent form

11  or an insurance binder completed for the loan

12  application, he asked Rodriguez to complete the forms.

13  He was initially directed to do this by McCaffrey and

14  Sienko who had worked with Rodriguez in the past.

15      As alleged in Count VI of the Indictment,

16  Marziale obtained a false verification of rent form,

17  false bank statements and a false insurance binder from

18  Rodriguez in connection with the loan for 35 Robin

19  Street.

20      For the 35 Robin Street loan, as well as the

21  other loans associated with properties owned by

22  Rodriguez, Marandola did not collect a down payment and

23  Attorney McNelis was falsely listed as the closing

24  attorney on documents submitted to Sierra Pacific.

25      Several other properties involved in this scheme

1    were properties owned or controlled by Marandola and

2    Marziale or their associates, such as 63 Wendell

3    Street, 52-54 Bergen Street, 61 Ledge Street, 12 Sue

4    Street and 245-47 Jewett Street.

5         In some instances, buyers were located by

6    Rodriguez, who was paid for his efforts, and in other

7    instances Marziale located a buyer.

8         With these loans, fraudulent supporting

9    documents were submitted, no down payment was collected

10   and Attorney McNelis was falsely identified as the

11   closing attorney.

12        Additionally, Ronci was falsely identified as a

13   real estate agent negotiating the transactions when, in

14   fact, the transactions were negotiated or arranged by

15   Marziale and Marandola or, in the case of 245-47 Jewett

16   Street, the seller of the property.

17        As alleged in Counts V and XIII of the

18   Indictment, 12 Sue Street was a property owned by DQ.

19   Marziale recruited a buyer for this property, JT, a

20   young woman who was a friend of his family member.

21        Marandola caused paperwork to be submitted to

22   the seller, DQ, indicating that the property sold for

23   $55,000.  Meanwhile, Marziale caused false paperwork to

24   be submitted to Sierra Pacific reflecting that the

25   property sold for $175,000.

1    DQ's signature was forged on documents submitted

2    to Sierra Pacific.  Marziale signed documents falsely

3    representing that JT was his niece, giving the false

4    impression that he was an approved source of gift funds

5    for the down payment.

6    JT, a first-time home buyer, purchased 12 Sue

7    Street with a federally insured loan in the amount of

8    $175,563.  She has since defaulted on this loan.

9    As alleged in Count XIX of the Indictment,

10   Marziale and Marandola employed similar techniques in

11   arranging for the purchase of 61 Ledge Street in the

12   name of Marziale's mother.

13   The documents and funds provided to DQ, the

14   seller, reflected that the sale price was $62,000.

15   However, Marziale obtained a loan from Sierra Pacific

16   in his mother's name in the amount of $171,830

17   purportedly to purchase 61 Ledge Street from DQ.

18   To obtain approval for the loan, he and

19   Marandola caused DQ's name to be forged on documents

20   submitted to Sierra Pacific and deeds filed with the

21   City of Providence.

22   By engaging in this scheme, Marziale was and the

23   other co-conspirators were unjustly enriched at the

24   expense of lenders, the FHA, buyers and, on occasion,

25   sellers.

1        THE COURT:  Thanks, Ms. Hebert.

2        Mr. Marziale, you've heard the elements of the

3   charges that the Government has brought against you

4   that you -- I understand you're prepared to plead

5   guilty to.

6        Do you understand that the Government would have

7   to prove each and every one of those elements beyond a

8   reasonable doubt in order for you to be found guilty of

9   any of those counts?

10        THE DEFENDANT:  Yes, I do.

11        THE COURT:  You also heard the facts that the

12   Government would prove if this case were to go to

13   trial.  Do you admit the facts as stated by the

14   Government as true?

15        THE DEFENDANT:  Yes, I do.

16        THE COURT:  Before I ask you about your change

17   of plea, do you have any questions for the Court or do

18   you want to confer with your attorney about any matter?

19        THE DEFENDANT:  No.  I'm okay.

20        THE COURT:  How do you now plead, Mr. Marziale,

21   to Counts I, V, VI, XIII and XIX of the Indictment

22   brought against you, guilty or not guilty?

23        THE DEFENDANT:  Guilty.

24        THE COURT:  This Court has heard from the

25   Government the evidence it would present if this matter

1   were to go to trial.  The Court has questioned the

2   Defendant regarding his understanding of the nature of

3   the proceedings and the consequences of entering a plea

4   of guilty to the charge.

5           It is, therefore, the finding of this Court in

6   the case of the United States versus Raffaele Marziale

7   that the Defendant is fully capable and competent of

8   entering an informed plea, that the Defendant is aware

9   of the nature of the proceedings and the consequences

10  of the plea and that the plea of guilty is a knowing

11  and voluntary plea supported by an independent basis in

12  fact containing each of the essential elements of the

13  charges; and, therefore, the plea is accepted, and the

14  Defendant is now adjudged guilty of those charges.

15          Sentencing will be set down for May 24th, 2016,

16  at 10 a.m.

17          Ms. Hebert, anything further for the Government?

18          MS. HEBERT:  No, your Honor.

19          THE COURT:  Any position on Mr. Marziale's

20  continued release?

21          MS. HEBERT:  No objection to continued release,

22  your Honor.

23          THE COURT:  Okay.  Thanks.

24          Mr. Connors, anything further for Mr. Marziale?

25          MR. CONNORS:  No, your Honor.  Thank you.

1          THE COURT:  Mr. Marziale, the conditions that

2     were placed upon you at the time of your initial

3     arraignment and release remain in full force and effect

4     until the time of sentencing.  Do you understand that?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Great.  We'll stand adjourned.

7     Thanks.

8          (Adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

        I, Karen M. Wischnowsky, RPR-RMR-CRR, do
hereby certify that the foregoing pages are a true and
accurate transcription of my stenographic notes in the
above-entitled case.


        ___June 27, 2016_____
        Date



        /s/ Karen M. Wischnowsky_____

        Karen M. Wischnowsky, RPR-RMR-CRR
        Federal Official Court Reporter